IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JAMES H. BALES | * | |
| | * | |
| v. | * | Civil No. 15-cv-03293-JFM |
| | * | |
| MARYLAND JUDICIARY/ | * | |
| ADMINISTRATIVE OFFICE OF THE | * | |
| COURTS | * | |

\* \* \* \* \* \*

## MEMORANDUM

Plaintiff James H. Bales ("Bales") brings suit against his former employer, the

Administrative Office of the Courts ("AOC"),[1] alleging the AOC discriminated against him

based on his age and disability status.  He brings claims for, *inter alia*, hostile work environment,

retaliation, failure to accommodate, and constructive discharge, pursuant to §504 of the

Rehabilitation Act of 1973, 29 U.S.C. 794 *et seq.* ("Rehabilitation Act"), and the Maryland Fair

Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't. § 20-602, *et seq.*  Now

pending is the AOC's motion to dismiss Bales' first amended complaint, or in the alternative, for

summary judgment. (ECF No. 17).  The motion is fully briefed, and no oral argument is

necessary. *See* Local Rule 105.6. For the reasons set forth below, the motion is granted and

Counts 1 through 11 are dismissed

---

[1] Bales initially brought this suit against the "Maryland Judiciary/Administrative Office of the Courts." (ECF No. 13).  The AOC argued "Maryland Judiciary" is not a proper defendant because "it is not a distinct legal entity capable of being sued." (ECF No. 17, p. 46).  Bales agreed and acknowledged he "would not object to the removal of the words 'Maryland Judiciary.'"  (ECF No. 22, p. 48).  Accordingly, I dismiss "Maryland Judiciary" as an active party to this case.

## BACKGROUND

At the motion to dismiss stage, this court accepts as true the facts alleged in the plaintiff's complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).  Plaintiff Bales is a resident of the State of Maryland, and his address is 1430 Dundalk Avenue, Baltimore, Maryland, 21222. (ECF No. 13, ¶ 3).  Defendant AOC, located in Annapolis, Maryland, is a court-supporting agency that "oversees and implements court policies established by the Chief Judge, the Court of Appeals, and the General Assembly." *Id.* at ¶ 4.  The AOC's Judicial Information Systems ("JIS") department hired Bales in 1994, and he worked at JIS in varying capacities until his early retirement in July 2014. *Id.* at ¶¶ 11, 299.  Throughout his period of employment, Bales alleges he was subjected to discrimination and harassment due to his age, disability status, and his engagement in protected activity.  Bales' factual allegations, which are numerous, can be separated into three distinct periods of employment: Bales' time at JIS Annex (January 1998 to February 2009), Bales' relocation to JIS Riva (February 2009 to May 2013), and Bales' reassignment to a new position at JIS Riva and his subsequent retirement (May 2013 to July 2014).

### JIS Annex (January 1998 to February 2009)

Prior to 1998, Bales alleges he was promoted several times, eventually reaching the title of "Information Specialist X" in JIS's LAN Department. *Id.* at ¶ 12.  Bales alleges he was "at all times a model employee who met or exceeded his employer's legitimate performance expectations in these positions, which included receiving a letter of commendation." *Id.* at ¶ 13. In January of 1998, Bales was transferred to the JIS Annex, located at 2004 Industrial Drive, Maryland, where he continued working as an Information Specialist X. *Id.* at ¶ 14.  At the

Annex, Bales worked with, *inter alia*, Robert Hannon ("Hannon") and Jason Thomas

("Thomas"). Bales' immediate supervisor was Jim Butler ("Butler"), a Senior Manager in LAN

Administration, who in turn reported to Phillip Braxton ("Braxton"), Executive Director of JIS.

*Id.* at ¶¶ 14-17. It was at the Annex where Bales alleges he "became the ongoing victim of office

bullying and pranks, primarily at the hands of Messrs. Thomas and Hannon, who came to be his

primary tormentors." *Id.* at ¶ 18. For example, Bales alleges his coworkers would throw pennies

in his direction and play various pranks on him including sabotaging his computer equipment,

unplugging his keyboard, removing the ball from his computer mouse, and switching network

wires on files servers. *Id.* at ¶¶ 17-18.

Eventually, Bales alleges he started complaining, sometimes on "a daily basis," to his

immediate supervisor, Butler. *Id.* at ¶ 21. However, Bales alleges the conduct did not stop;

rather, the nature of the conduct escalated and Butler "would himself engage in very

inappropriate conduct." *Id.* at ¶ 22. For example, Bales contends he was "continually ridiculed

about his age with demeaning comments about his sight, hearing, and alleged diminished mental

capacity, along with repeated ageist comments that he was 'old.'" *Id.* at ¶ 23. Furthermore,

Bales alleges "Thomas and others would gleefully have farting and belching contests and, on one

occasion, deliberately farted on Mr. Bales." *Id.* at ¶ 24. "On other occasions, Mr. Thomas and

others would proceed to lick each others' hands in a perverted manner in an attempt to disgust

and provoke Mr. Bales, and further made sexually derogatory comments about Mr. Bales'

daughter." *Id.* at ¶ 25.

By 2004, Bales alleges he was experiencing serious physical and mental complications

because of his work environment. *Id.* at ¶ 29. In response, he allegedly "repeatedly emailed,

spoke with and notified" Braxton, Butler's superior, of the "harassing and intolerable behavior taking place at the JIS Annex." *Id*.  Bales alleges he asked to "be relocated out of this antagonistic environment," but Braxton failed to take remedial action or relocate Bales away from the Annex. *Id.* at ¶¶ 32-33.  In March of 2005, Bales claims he sought medical treatment with Dr. Jerome Rubin, PhD, who diagnosed Bales with Chronic Stress Disorder ("CSD"), allegedly resulting from Bales' work environment. *Id.* at ¶¶ 34-35.

From 2005 to 2007, Bales alleges the harassment continued and he repeatedly complained to superiors and asked to be relocated to a different office at JIS Riva. *Id*. at ¶¶ 36-50.  However, Bales alleges his complaints and requests to be transferred out of JIS Annex to JIS Riva were largely ignored and his coworkers continued their pattern of harassment. *Id*.  For example, on one occasion in November of 2005, Thomas "wildly scratch[ed] his crotch" and then "immediately and purposely touched [] Bales with his crotch scratching hand." *Id*. at ¶ 44.

On December 18, 2008, finally "[e]xasperated by . . . inactions," Bales claims he filed a written "Grievance" with Braxton asking again to be "relocated to JIS Riva." *Id*. at ¶¶ 51-54. The grievance also reiterated the conduct Bales had been subjected to at JIS Annex, specifically noting he had suffered "personal attacks, bullying, discredit, personal disrespect, judiciary disrespect, ridicule, provocation, . . . personal family commentary, farting at [his] desk, body slamming, perverted acts of licking each other's hands, equipment and project sabotage, selective persecution, false accusation and antagonism[,] . . . harassment, age commentary, [and] racial commentary." *Id*. at ¶¶ 54-55.  Bales claims, in response to his "Grievance," Braxton sent him a memorandum dated January 15, 2009, indicating Braxton "concluded that [he does] not have adequate 'verifiable' information about these occurrences to reach an informed decision."

*Id.* at ¶ 61.  Accordingly, Braxton advised Bales to consider contacting the Office of Fair

Practices ("OFP") to investigate his "stress-related physical problems."  *Id*. at ¶ 62.

Bales, instead, escalated his complaint to Human Resources on January 22, 2009,

notifying Lee Robinson, manager of the Office of Employee Relations in the Human Resources

Department. *Id.* at ¶ 67.  Bales also made "an unusual plea directly to Frank Broccolina," who

was the head of the AOC, requesting that Bales be moved to JIS Riva. *Id*. at ¶ 70.  As a result of

his complaints, Bales alleges he was subjected to increased scrutiny and false accusations

including, *inter alia*, allegations he was "cursing" at work when he claims he was not, and being

limited to a thirty-minute lunch period, "despite the fact that other employees at the JIS Annex

routinely enjoyed an hour or more for lunch each day and numerous breaks during the day." *Id*.

at ¶ 79.  Bales alleges he reported these incidents to the Human Resources Department,

expressing his concerns these actions were "retaliatory because of recent complaints and

grievances." *Id.* at ¶ 80.

<u>JIS Riva (February 2009 to May 2013)</u>

In February of 2009, the Department of Human Resources transferred Bales to JIS Riva

while OFP continued its investigation into Bales' claims. *Id.* at ¶ 81.  Unfortunately for Bales,

OFP advised him on May 18, 2009 its investigation was complete and it did "not substantiate

[his] claim of discrimination."  Bales alleges these were "sham" findings and, as a result, he

"was subjected to continued harassment, discrimination and retaliation from after from the latter

parts of 2009 up through the time he was compelled to retire" in 2014. *Id*. at ¶¶ 82-84.  For

example, Bales claims the relocation from JIS Annex to JIS Riva was "held against him in his

performance evaluations" in 2009 and 2010. *Id.* at ¶¶ 82-84  And on January 6, 2012, Bales

suffered a heart attack allegedly "stemming from the ongoing constant harassment and hostile

work environment that exacerbated his underlying anxiety and stress disorder." *Id*. at ¶ 89.

Bales alleges the harassment continued at an off-site training in March 2012 that was also

attended by Thomas from JIS Annex. *Id*. at ¶ 94.  During the course of the class, Bales claims

Thomas repeatedly harassed him by, *inter alia*, revealing personal information pertaining to his

divorce, making "numerous ageist comments to Mr. Bales[,] . . . sarcastically suggesting that he

lacked the mental capacity to complete very basic tasks and assignments discussed at the class,"

and repeatedly slamming his desk chair into Bales' desk. *Id*. at ¶¶ 92-102.  Bales complained

about this incident, but the AOC found no evidence to support Bales' claim of discrimination at

the training. *Id.* at ¶¶ 106, 109.

On April 25, 2012, Bales was diagnosed with symptoms consistent with Post-Traumatic

Stress Disorder ("PTSD"), which Bales alleges stemmed "from the stress and anxiety attributable

to [his] working environment." *Id*. at ¶¶ 116-17.  After this diagnosis, Bales engaged in

discussions with the Office of Legal Counsel regarding "a reasonable accommodation under the

ADA." *Id.* at ¶ 118-20.  On June 7, 2012, while on approved Family and Medical Leave

("FMLA"), the AOC's Employee Relations Officer notified Bales he was being referred to the

State Medical Director for a medical evaluation, the purpose of which was "to receive advice

regarding Mr. Bales' functional abilities and limitations pertaining to his position duties with or

without a reasonable accommodation." *Id*. at ¶ 135-39.  Bales alleges he was "taken aback" by

this request because he was "already under the treatment of his own medical providers." *Id*. at ¶

137.  He claims he attended the medical examination, despite believing the evaluation was in

violation of federal and state disability laws, because he was "threat[ened with] discipline." *Id.* at

143.  Despite Bales' reluctance to attend the medical examination, the State Medical Examiner eventually confirmed the PTSD diagnosis, but he also referred Bales to another physician for a psychological examination. *Id*. at ¶¶ 146-49.

Upon returning to work at JIS Riva, Bales claims he was again targeted by Butler and Hannon despite the fact they were still assigned to JIS Annex. *Id*. at ¶ 150.  For example, in July 2012, Bales claims he was asked to complete daily reports, even though other System Administrators were not require to submit such reports. *Id*. at ¶ 151.  When Bales asked about why he had to complete these reports, he was informed "it was because he was working at JIS Riva Road." *Id.* at ¶ 152.  On September 6, 2012, Bales filed a discrimination charge with the EEOC and Maryland Commission on Civil Rights ("MCCR") asserting age, disability discrimination, and retaliation. (*Id.* at ¶ 155; *see also* ECF No. 17, Ex. 2, Attachment A).

In September 2012, despite the fact he has been transferred to JIS Riva, Bales was informed he would need to attend weekly in-person meetings with Thomas, Hannon, and Butler, all three of which he had previously complained about. (ECF No. 17, ¶¶ 156-58).  Bales alleges he suffered a severe panic attack while at work at the prospect of having to participate in the meetings with these coworkers. *Id*. at  ¶ 160.  On at least one occasion, Bales missed a meeting "due to illness," and thereafter all email strings contained the message "attendance is **required** for Jim Bales." *Id*. at ¶ 158 (emphasis in original).  Bales claims this was "simply another way to harass and torment" him. *Id.*  On September 17, 2012, Bales, through counsel, made a written request to attend these meetings via telephone conference. *Id.* at ¶ 162.  Bales alleges his "stress and anxiety" became so pronounced he began treatment and psychotherapy on September 21, 2012. *Id.* at ¶ 163.

7

On October 1, 2012, the AOC advised Bales they would not agree to the telephonic meetings until he underwent a second medical evaluation because the "AOC deemed Dr. Lyons' first evaluation to be incomplete." *Id.* at 164.  Bales contends this request was unreasonable and perhaps in violation of EEOC guidelines, "given that Mr. Bales had already submitted the requisite medical documentation from his physicians." *Id.* at ¶ 165.  Bales further alleges that "in retaliation for Mr. Bales' having requested an accommodation, for having filed an EEO charge, and for having complained about discrimination generally," the AOC threatened in a letter from their counsel that Bales' failure to cooperate with the medical evaluation would result "in adverse consequences, potentially severe." *Id.* at ¶¶ 167-68.  Bales claims when he requested to change the date of the medical evaluation scheduled for October 9, 2012, the "AOC, through its counsel, continued to retaliate and harass Mr. Bales over [his] request." *Id.* at ¶¶ 171-72.

Bales further alleges he was subjected to ongoing harassment and scrutiny from late November 2012, *id.* at ¶ 183, and "increased scrutiny, retaliation, harassment, and disparate treatment almost over every facet of his employment" throughout Winter and Spring of 2013, *id.* at 196.  During this time period, he alleges that despite multiple requests to be exempted from in-person interactions with Thomas, Hannon, and Butler, emails were sent regarding meetings with these individuals. *Id.* at 194.  Soon thereafter, however, Bales was allowed to attend these meetings telephonically. *Id.* at 195.  But this did not resolve the situation; in April of 2013, Bales continued to be singled out on group email notices for meetings, which would contain the words "Attendance **required** for Jim Bales" on the email to the entire group, "causing him humiliation, embarrassment and stress over being singled out in such a fashion and to be looked at by his co-workers in a poor light." *Id.* at 200 (emphasis in original).

<u>Reassignment and Resignation (May 2013 to July 2014)</u>

On May 7, 2013, Bales alleges he filed an amended charge with the EEOC after experiencing "continued harassment, ridicule, discrimination and retaliation from employees of the AOC." *Id.* at 205. Roughly one month after filing his amended charge, the AOC notified Bales he was being reassigned to a newly created position within the Information Security Unit, "Information Security Administrator II," with "comparable salary, duties, responsibilities and technical experience to his prior position." *Id.* at ¶¶ 208-09. Bales claims, however, this new position was a "*de facto* demotion" because he suggests the new position "did not require a similar level of expertise, had far less visibility, was lower level in stature and nature, did not offer the opportunity to continuing working in the engineering group as promised and, as a result, offered no meaningful opportunity for career advancement." *Id.* at ¶ 231. Specifically, Bales contends his new tasks were not as technical in nature, as he had been assured they would be, but rather "predominantly administrative in nature." *Id.* at ¶ 235. Furthermore, Bales alleges he was notified of a potential move from a private office to a cubicle in November 2013, which was "indicative of a demotion." *Id.* at ¶¶ 238-39. Bales further alleges that in late December 2013, Thomas informed Bales he was using his systems access to continually watch and monitor Bales' computer usage. *Id.* at ¶ 246. The "*de facto*" demotion, request to potentially move to a cubicle, and Thomas' suggestion he was monitoring Bales' computer usage, combined to caused "Mr. Bales' PTSD to worsen" and he "experienced nightmares, sleeplessness and panic, along with increasingly high blood pressure." *Id.* at ¶¶ 247-48.

On January 30, 2014, Bales and other members of his department attended a Workplace Bullying presentation at the AOC. *Id.* at ¶ 249. Bales alleges that as he watched the presentation

he was "overwhelmed with sadness" because he had to re-live the torment he had endured for years at the AOC. *Id.* at ¶¶ 249-55.  Bales "began to get teary" and he abruptly left the presentation. *Id.* at ¶ 255.  Immediately thereafter, Bales contacted his physician who instructed him to seek medical attention. *Id.* at ¶ 256.  Accordingly, Bales requested leave for the remainder of the day to seek treatment for his "severe panic attack, recurring migraine and chest pains." *Id.* at ¶¶ 255-56.   The next day, the AOC placed Bales on administrative leave, citing Bales' "outburst, use of profanity and loss of emotional control" at the presentation as justification. *Id.* at ¶¶ 262-63.  Bales contends this decision was retaliatory in nature. *Id.* at ¶ 262.  He claims he did not use profanity, but even if he did, it would be no grounds for placing him on leave because he alleges his coworkers regularly used profanity "freely in the workplace without any repercussion from AOC management." *Id.* at ¶ 267.

Bales further contends that "[i]n a blatant act of ongoing harassment," the AOC's Employee Relations Officer required him to sign a "Consent for Release of Medical Records," and to submit to a medical evaluation with the State Medical Director scheduled for February 25, 2014, in order to assess Bales' "ability to perform the essential functions of his position." *Id.* at ¶¶ 270-75.  The medical evaluation was rescheduled for March 2014 after Bales' counsel requested clarification of the reasons for the referral; Bales alleges he eventually complied and underwent examination "[u]nder threat of discipline" on March 12, 2014. *Id.* at ¶ 280.

Bales alleges on April 4, 2014, he was advised the AOC was compelling him, under further "threats of discipline to include termination," to once again submit to an evaluation by the State Medical Director. *Id.* at ¶ 285.  Bales, through counsel, pushed back on these additional requests. *Id.* at ¶¶ 290-91.  On June 23, 2014, Bales was advised the AOC had scheduled a

meeting for June 25, 2015, to address the "current situation," which he would be required to attend. *Id.* at ¶¶ 292-93.  On June 25, 2014, Bales informed the AOC he would not attend the scheduled meeting that day because he was taking previously approved FMLA leave. *Id.* at ¶¶ 295-96.

On July 25, 2014, Bales submitted paperwork for early retirement, effective July 1, 2014. *Id.*  Bales contends he was forced to apply for early retirement to protect "both his physical and mental well-being" after the "continuing harassment, discrimination and retaliation" he was subjected to at the AOC. *Id.* at ¶¶ 298-99.  Bales further contends he receives less in early retirement benefits than he did as an employee or if he had remained an employee until Spring 2015, when he would have been eligible for full State retirement benefits. *Id.* at ¶ 301.

Bales filed his second amended charge with the EEOC on February 13, 2015. *Id.* at 302. He then filed his original complaint with this court on October 28, 2015 (ECF No. 1), and after the AOC filed its motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 10), Bales filed his first amended complaint on May 13, 2016. (ECF No. 13).  The amended complaint alleges the AOC subjected Bales to discrimination and harassment due to his age and disability status in violation of §504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 *et seq.* ("Rehabilitation Act") and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't. § 20- 602, *et seq.*  Specifically, Bales' amended complaint asserts eleven count of discrimination.  Pursuant to § 504 of the Rehabilitation Act, Counts 1-4 allege disability discrimination as follows: "Discrimination in the Terms and Conditions of Employment" (Count 1); "Retaliation in the Terms and Conditions of Employment" (Count 2); "Failure to Reasonably Accommodate" (Count 3); and "Constructive

Discharge" (Count 4). *Id.* at ¶¶ 312-65.  Pursuant to MFEPA, Counts 5-8 allege disability

discrimination as follows: "Discrimination in the Terms and Conditions of Employment" (Count

5); "Retaliation in the Terms and Conditions of Employment" (Count 6); "Failure to Reasonably

Accommodate" (Count 7); and "Constructive Discharge" (Count 8). *Id.* at ¶¶ 366-95.  Pursuant

to MFEPA, Counts 9-11 allege age discrimination as follows: "Discrimination in the Terms and

Conditions of Employment" (Count 9); "Retaliation in the Terms and Conditions of

Employment" (Count 10); and "Constructive Discharge" (Count 11). *Id.* at ¶¶ 396-418.

**STANDARD**

The AOC has filed a motion to dismiss Bales' first amended complaint under Rule

12(b)(6) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil

Procedure 56(c). I consider this motion as one to dismiss under Rule 12(b)(6).[2]  To adequately

state a claim under Rule 12(b)(6), a complaint, relying on only well-pled factual allegations,

must state at least a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The

"mere recital of elements of a cause of action, supported only by conclusory statements, is not

sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d

435, 439 (4th Cir. 2012).  In order to determine whether Bales' complaint has crossed "the line

from conceivable to plausible," the court must employ a "context-specific inquiry," drawing on

the court's "experience and common sense." *Iqbal*, 556 U.S. at 680.  When performing this

---

[2] The AOC has noted its motion can alternatively be construed as one for summary judgment. A court may properly award summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Because this is not the case, I consider this motion as one to dismiss and not as one for summary judgment.

inquiry, the court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The court need not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), nor must it agree with legal conclusions couched as factual allegations, *Iqbal,* 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009).

## ANALYSIS

The AOC moves to dismiss all eleven counts in Bales' first amended complaint on the grounds of (I) various jurisdictional and procedural issues, and (II) Bales' failure to allege facts sufficient to support his claims. (ECF No. 17, pp. 1-2).  I consider these in turn.

### I.      Jurisdictional and procedural issues

The AOC argues Bales' claims are barred by various jurisdictional and procedural issues. I consider: (a) whether a two- or three-year limitations period applies; (b) whether Bales sufficiently exhausted administrative remedies; (c) whether Bales needed to exhaust any remedies for his retaliation claims; (d) whether the "continuing violation theory" can revive stale claims; (e) whether laches bars any of Bales' claims; and (f) whether Bales needed to first file a tort claim notice in compliance with the Maryland Tort Claims Act prior to bringing his MFEPA claims.

### A.  *Applicable limitations period*

Claims brought under MFEPA are subject to a two-year statute of limitations period. Md. Code Ann., State Gov't § 20-1013(a)(3) (the civil action must be "filed within 2 years after the alleged unlawful employment practice occurred"). Regarding claims brought under the Rehabilitation Act, however, the parties disagree over the applicable limitations period. Bales urges this court to apply a three-year limitations period (ECF No. 22, p. 22), while the AOC argues a two-year period applies. (ECF No. 17, p. 12) Despite Bales' suggestions the law is "settled in regards to this issue" and Maryland courts "apply the three-year limitations period governing civil actions to ADA and Rehabilitation Act claims" (ECF No. 22, p. 23), I find a two-year limitations period applies.[3]

The ADA and Rehabilitation Act do not provide a statute of limitations. Accordingly, courts "borrow" the most appropriate or analogous state statute of limitations and apply it to the federal cause of action. *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011) ("We therefore borrow the state statute of limitations that applies to the most analogous state-law claim."). Accordingly, the applicable limitations period depends on the most analogous state-law claim or statutory scheme. The AOC argues, under Maryland law, the most analogous

---

[3] Despite Bales' assertions, the Fourth Circuit has neither considered nor determined the limitations period applicable to Rehabilitation Act and ADA claims after the Maryland civil rights statutes were amended in 2007 establishing a private right of action for discrimination, and again in 2009 providing enhanced protections for individuals with disabilities that mirror those provided by the ADA. Indeed, whether an action under Title II of the ADA is subject to a two-or three-year limitations period is currently an appeal now pending in the Fourth Circuit. *Semenova v. Maryland Transit Administration*, No. 15-2125. That case, however, deals with disability discrimination in places of public accommodation, which is not squarely addressed in MFEPA. In comparison, MFEPA directly addresses age and disability discrimination in the employment context, which only bolsters the conclusion that a two-year limitations period applies in the present case.

statutory scheme is MFEPA (Title 20 of the State Government Article), which has a two-year limitations period. Md. Code Ann., State Gov't § 20-101 *et seq.*   I concur.

MFEPA prohibits discrimination based on disability, among other protected classes, in places of public accommodations, *id.* §§ 20-304, 20-305; employment, *id.* § 20-606; housing, *id.* §§ 20-705, 20-706, 20-707; and certain commercial enterprises, *id.* §§ 20-402, 20-501.  The Maryland General Assembly amended its civil rights statute in 2007 to create a private right of action for employment discrimination, including for discrimination based on disability. 2006 Maryland H.B. 1034, 2006 Leg., 421st Sess., codified at State Gov't § 20-1013. Prior to 2007, MFEPA's predecessor statute, Md. Ann. Code Art. 49B, *did not provide for a private right of action* to challenge employment discrimination; rather, it contained an administrative remedy that provided for a six-month limitations period for filing an administrative charge of discrimination. Article 49B, § 9A.  In 2009, the General Assembly of Maryland significantly expanded the rights of persons with disabilities under MFEPA by enacting specific legal protections that mirror ADA protections, including requiring the reasonable accommodation of workplace disabilities, *id.* § 20-606(a)(4); prohibiting an employer from retaliating against an individual for opposing discriminatory acts, *id.* § 20-606(f); and prohibiting discrimination because one is "regarded as" disabled or has a "record of" a disability, *id.* § 20-601(b)(1). 2009 Maryland Laws ch. 299, § 1 (An Act concerning Discrimination in Employment – Expansion of Disability Rights).

I agree that MFEPA, in its current form, authorizes the same expansive relief and recovery of damages as provided under the ADA *and* provides specific legal protections that mirror ADA protections.  Therefore, I find MFEPA is the most analogous state law to the

15

Rehabilitation Act, and its two-year limitations period applies in the present case. *Cf. Howerton v. Bd. of Educ. of Prince George's Cnty.*, No. TDC-14-0242, 2015 WL 4994536, at *7 (D. Md. Aug. 19, 2015) (applying MFEPA's two-year statute of limitations to plaintiff's Title VI claims); *11 *Melendez v. Bd. of Educ. for Montgomery Cnty.*, No. DKC-14-3636, 2015 WL 3540947, at *9 (D. Md. June 3, 2015) (stating MFEPA "is the state law analogue of Title VII")

Accordingly, all claims brought under § 504 of the Rehabilitation Act and MFEPA are subject to a two-year limitations period.

### B. *Administrative exhaustion*

The AOC alleges Bales "failed to exhaust his administrative remedies by filing a timely administrative charge with respect to alleged discriminatory acts occurring before August 18, 2014, six months prior to the filing of the charge." (ECF No. 17, p.18). Bales, however, contends he exhausted his administrative remedies in a timely fashion, and because he had 300 days to file his EEOC claim, rather than 180 days as the AOC suggests, all his claims are timely. Neither party is entirely correct. Although I find Bales had 300 days to file his claim, certain alleged acts of discrimination occurred outside this 300-day period and cannot be considered for Bales' MFEPA claims.

First, for claims brought pursuant to §504 of the Rehabilitation Act, Bales is not required to exhaust administrative remedies. "As Judge Bredar explained in *N.T. v. Balt. City Bd. of School Comm'rs*, Civil No. JKB–11–356, 2011 WL 3747751, at *1 (D. Md. Aug.23, 2011):

> A lawsuit claiming a violation of section 504 of the Rehabilitation Act ... is conducted according to "[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 (42 U.S.C.2000d et seq.) (and in subsection (e) (3) of section 706 of such Act (42 U.S.C.2000e–5), applied to claims of discrimination in compensation)." 29 U.S.C. § 794a(a)(2). The procedures in those other statutes, adopted by reference, do not mandate exhaustion of

16

> administrative remedies. *See Neighborhood Action Coalition v. City of Canton, Ohio,* 882 F.2d 1012, 1015 (6th Cir. 1989) ("Title VI litigants need not exhaust their administrative remedies before pursuing their private cause of action in federal court")."

*Reyazuddin v. Montgomery Cty., Md.*, No. CIV.A. DKC 11-0951, 2012 WL 27241, at *3 (D. Md. Jan. 4, 2012). Accordingly, there is no exhaustion requirement for Bales' Rehabilitation Act claims.

Under MFEPA, however, Bales is required to exhaust the administrative process. Md. Code Ann., State Gov't § 20–1013(a); *see also Thompson v. Golden M Co.*, No. CIV. WDQ-14-3254, 2015 WL 3888753, at *3 (D. Md. June 22, 2015) ("Federal and Maryland state discrimination claims are subject to administrative exhaustion."). A plaintiff exhausts his administrative remedies by filing an EEOC charge and obtaining a "right-to-sue" letter; failure to do so "deprives the federal courts of subject matter jurisdiction over the claim." *Golden M Co.*, 2015 WL 3888753, at *3 (citing *Jones v. Calvert Grp., Ltd.,* 551 F.3d 297, 300 (4th Cir. 2009)). Specifically, under MFEPA, "a complainant may bring a civil action against the respondent alleging an unlawful employment practice, if:

> (1) the complainant initially filed a timely administrative charge or a complaint under federal, State, or local law alleging an unlawful employment practice by the respondent;
> (2) at least 180 days have elapsed since the filing of the administrative charge or complaint; and
> (3) the civil action is filed within 2 years after the alleged unlawful employment practice occurred.

Md. Code Ann., State Gov't § 20-1013(a)(1-3).

For the first requirement under § 20-1013(a), "[t]imeliness [is] to be strictly enforced."

*Tangires v. Johns Hopkins Hosp.,* 79 F. Supp. 2d 587, 597 (D. Md. 2000) (citing *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152 (1984)). Although the AOC suggests Bales needed to

file his administrative charges within 180 days of an alleged unlawful unemployment practice

(ECF No. 17, p. 21-22), Bales actually had 300 days to timely file. *Jones v. Calvert Grp., Ltd.*,

551 F.3d 297, 300 (4th Cir. 2009) (noting although the "basic limitations period is 180 days after

the alleged unlawful employment practice," the limitations period "is extended to 300 days when

state law proscribes the alleged employment practice and the charge has initially been filed with

a state deferral agency"); *see also Bishop v. Bd. of Educ. of Calvert Cty.*, No. CIV.A. DKC 11-

1100, 2011 WL 2651246, at *3 ("Thus, in Maryland, the time for filing a charge of

discrimination . . . is 300 days."). Accordingly, Bales had 300 days to file his administrative

claim from an alleged unlawful employment action, and because Bales alleges he filed

administrative charges on September 6, 2012, May 7, 2013, and February 2015, actions

occurring more than 300-days prior to these dates will not be considered.

### C. Exhaustion for retaliation claims

Although the previous section concluded exhaustion is required for MFEPA claims,

Bales contends his retaliation claims are specifically exempt from this requirement. Indeed,

while the AOC suggests that Bales' retaliation claims are barred because he failed to file a timely

charge (ECF No. 17, p. 20), Bales contends his retaliation claims "do not require administrative

exhaustion when there [are] pending prior administrative charges." (ECF No. 23, p. 24). Bales'

view is correct and he is not required to exhaust administrative remedies for retaliation claims

stemming from previously-filed EEOC charges, provided those charges were timely.

In *Nealon v. Stone*, the United States Court of Appeals for the Fourth Circuit specifically

addressed whether a  plaintiff asserting a "claim of retaliation for filing a previous EEOC charge

must exhaust administrative remedies before suing in federal court." 958 F.2d 584, 590 (4th Cir.

18

1992).  There, the court first stated "[a]ll other circuits that have considered the issue have

determined that a plaintiff may raise the retaliation claim for the first time in federal court." *Id.*

Finding "the rationales [from other circuits] persuasive," the Fourth Circuit "adopt[ed] this

position." *Id.* The court justified its adoption of the rule, explaining that it "is the inevitable

corollary of our generally accepted principle that the scope of a Title VII lawsuit may extend to

any kind of discrimination like or related to allegations contained in the charge and growing out

of such allegations during the pendency of the case before the Commission." *Id.*  Lastly, the

court cited practical concerns for not requiring a second EEOC filing:

> [H]aving once been retaliated against for filing an administrative charge, the
> plaintiff will naturally be gun shy about inviting further retaliation by filing a
> second charge complaining about the first retaliation . . . [W]e [therefore] join the
> other circuits that have spoken to the question in adopting the rule that a separate
> administrative charge is not prerequisite to a suit complaining about retaliation for
> filing the first charge.

*Id.* (citing *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir.1989)).  The Fourth Circuit

later upheld *Nealon* in *Jones v. Calvert Grp., Ltd.*, further clarifying the alleged retaliatory act

need not even occur "during the pendency of the administrative investigation of the prior EEOC

charge." 551 F.3d 297, 302 (4th Cir. 2009).  The alleged retaliatory act can even be a "discrete

act" such as a "termination," and exhaustion still is not required, provided the claim "relates

back" to the administrative charge. *Id.* at 303.

Thus, if Bales' filing of his EEOC complaint resulted in the alleged retaliatory acts, then

those acts relate back to the administrative charge, and no second EEOC charge is required. *See*

*Nealon,* 958 F.2d at 590; *see also Brown v. Hartshorne Public Sch. Dist. No. 1,* 864 F.2d 680,

682 (10th Cir.1988) ("[A]n act committed by an employer in retaliation for the filing of an

EEOC complaint is reasonably related to *that complaint,* obviating the need for a second EEOC

complaint." (emphasis added)).  If, however, Bales' allegations of retaliation were not the result of his filing of an EEOC charge, then the court must analyze whether the "retaliation claim relates back to the charge that is properly before [the court]." *Jones*, 551 F.3d at 304.

Accordingly, Bales' retaliation allegations do not require exhaustion and can be considered by this court, provided either: (1) the alleged retaliatory acts stemmed from Bales' filing of a timely EEOC charge or (2) relate back to a timely-filed EEOC charge.

### D. *Continuing violation doctrine*

Given that a two-year limitations period applies to claims brought under the Rehabilitation Act and MFEPA, the parties next disagree over which alleged unlawful employment practices this court can consider.  The AOC argues "all claims in all counts" alleging unlawful employment practices occurring before October 28, 2013, are time-barred by the statute of limitations. (ECF No. 17, p. 17).  In comparison, Bales contends, under the "continuing violation theory," his claims are timely because he has alleged "years of ongoing and continuing disability harassment and failure to accommodate," and therefore his "claims fall into the category of a continuing violation under Maryland law." (ECF No. 22, p. 25).  Neither party is entirely correct.

The continuing violation doctrine "allows for consideration of incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination, *i.e.* when the incidents make up part of a hostile work environment claim." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)).  Although there are varying approaches to applying the "continuing violation theory," Maryland courts have decided the best test is the "course of conduct test,"

which asks whether "the separate acts of discrimination are 'closely enough related' to form a continuing violation." *Prince of Peace Lutheran Church v. Linklater*, 28 A.3d 1171, 1188 (Md. 2011) (citing *Richards v. CH2M Hill, Inc.*, 29 P.3d 175, 182 (Cal. 2001)) (internal citations omitted). This is because the "course of conduct test" is more compatible with the Supreme Court's position in *Morgan*, where the Court held that Title VII:

> precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period. We also hold that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period. The application of equitable doctrines, however, may either limit or toll the time period within which an employee must file a charge.

*Id.* at 1188 (citing *Morgan*, 536 U.S. at 105).

The AOC, however, correctly clarifies there is a difference between acts comprising a "continuing violation" and "discrete discriminatory acts." Indeed, "discrete discriminatory acts" "occur[]" on the day they "happened," and therefore the applicable limitations period applies to claims based on such discrete acts. *Morgan*, 536 U.S. at 110. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," and "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Holland*, 487 F.3d at 220 (citing *Morgan*, 536 U.S. at 113). Discrete acts regarding retaliatory adverse employment decisions include "acts such as termination, failure to promote, denial of transfer, or refusal to hire," and each such incident "constitutes a separate actionable unlawful employment practice." *Morgan*, 536 U.S. at 114 (internal citations omitted).

Accordingly, "[p]rovided an act contributing to Bales' [hostile work environment claim] occurs within the filing period, the entire time period of the hostile environment may be

considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117; *see also Gilliam v. S.C. Dep't of Juvenile Justice,* 474 F.3d 134, 141 (4th Cir.2007) ("Under Morgan, an incident falling within the applicable limitations period need only, in order for the continuing violation doctrine to apply, have contributed to the hostile work environment.").  However, if Bales' only alleged discriminatory acts within the applicable two-year limitations period are *discrete* discriminatory acts or acts unrelated to the hostile work environment, this court will be unable to consider the untimely portion of the hostile work environment allegations.

### E.  Laches

The AOC further contends Bales' claims are barred by laches because he "waited for years to bring his suit." (ECF No. 17, p.21).  Bales, however, contends "[t]he defense of laches is improper as a matter of law when a cause of action has a statutorily enumerated limitations period." (ECF No. 22, p.26) (citing *Haley Paint Company v. E.I. DuPont De Nemours*, 279 F.R.D. 331, 336 (D. Md. 2012)).  The Supreme Court has explicitly rejected Bales' argument, stating "an employer may raise a laches defense, which bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002).  Despite this, however, Bales' claims are still not barred by laches.

The equitable defense of laches requires a defendant to prove "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 409 (4th Cir. 2005) (citing *White v. Daniel,* 909 F.2d 99, 102 (4th Cir.1990) (internal quotation marks omitted)).  "The first element of laches, lack of diligence, is satisfied where a plaintiff has unreasonably delayed in pursuing

22

his claim." *Id.* "When evaluating the reasonableness of a delay, courts are reluctant to penalize

plaintiffs who have simply waited for the EEOC (or its state counterpart) to act." *Westmoreland*

*v. Prince George's Cty.*, No. CIV.A. TDC-14-0821, 2015 WL 996752, at *14 (D. Md. Mar. 4,

2015) (citing Holsey v. Armour & Co., 743 F.2d 199, 211 (4th Cir.1984)).  In addition to an

unreasonable delay, there "must be a clear showing of substantial prejudice to the defendant's

ability to defend itself." *Pande v. Johns Hopkins Univ.*, 598 F. Supp. 1084, 1088 (D. Md. 1984).

Moreover, a "finding of prejudice cannot rest on the [defendant's] generalized assertions.

Prejudice must arise from and be assessed with respect to the facts of each claim." *EEOC v.*

*Ches. & Ohio R.R. Co.,* 577 F.2d 229, 234 (4th Cir.1978).

In *Knickman v. Prince George's County*, this court dismissed a plaintiff's employment

discrimination claim based on a laches defense.  187 F. Supp. 2d 559, 565-57 (D. Md. 2002).

There, "six and a half years elapsed from the time the action accrued to the service of

defendants," and importantly, "two years passed from the issuance of the right-to-sue letter until

service." *Id.* at 567.  The court found the plaintiff in *Knickman* did not "provide an acceptable

reason for the delay," which "created prejudice against the defendants" because "the EEOC file

ha[d] been destroyed and witnesses' memories [had] faded over time." *Id.*  And in *Pande v.*

*Johns Hopkins Univ.*, this court again found a plaintiff's claims were barred by laches.  There,

the court found the plaintiff failed to be diligent where there "was a ten-year delay between the

filing of [plaintiff's] discrimination charge and the filing of the instant law suit," and the plaintiff

left the country for seven of the ten years. *Pande*, 598 F. Supp. at 1087.  In addition, the court

found the plaintiff's delay prejudiced the defendant's ability to defend itself because: (1) most of

the "persons who allegedly discriminated against [plaintiff]" were "no longer employed by the

University, several [had] moved out of state, and others [had] retired and [had] aged"; and (2) "much of the documentary evidence relevant to this case ha[d] been discarded, destroyed or irretrievably dispersed." *Id.* at 1088.

While the AOC is correct that Bales' allegations span many years, this case is unlike *Knickman* and *Pande*, and it does not necessarily follow that Bales failed to act diligently. Indeed, while it is true Bales *could* have likely filed this suit earlier, this does not rise to the level of an "unreasonable delay" within the laches context.  Here, unlike in *Knickman* where the plaintiff waited two years to sue after receiving his right-to-sue letter, Bales filed this suit within 90 days of receiving his right-to-sue letter. *Knickman,* 187 F. Supp. 2d at 565-57; *see also Westmoreland v. Prince George's Cty.*, No. CIV.A. TDC-14-0821, 2015 WL 996752, at *14 (D. Md. Mar. 4, 2015) (citing Holsey v. Armour & Co., 743 F.2d 199, 211 (4th Cir.1984) ("When evaluating the reasonableness of a delay, courts are reluctant to penalize plaintiffs who have simply waited for the EEOC (or its state counterpart) to act."))  Furthermore, this case is unlike *Pande* where the plaintiff essentially sat on his rights, waiting ten years to file suit while not even being in the United States for a majority of the time. *Pande*, 598 F. Supp. at 1087.  Here, Bales undertook numerous actions to protect his rights, including filing grievances and appeals at work, and filing multiple charges with the EEOC and MCCR.

Moreover, even assuming Bales "unreasonably delayed" in filing his claim, there "must be a clear showing of substantial prejudice to the defendant's ability to defend itself." *Pande*, 598 F. Supp. At 1088.  The AOC contends that because Bales "wait[ed] so long to file a [suit] . . . [the AOC] has been prejudiced as a result since witnesses have left its employment . . . and memories have faded." (ECF No. 17, p. 22) (citing *Chancellor v. Coca-Cola Enterprises, Inc.*,

675 F.Supp.2d 771, 776-777 (S.D. Ohio 2009)).  Even assuming that some of the employees

have left the AOC's employment and some memories have faded, this does not rise of the level

of prejudice needed for laches to bar Bales' claims.  There is no suggestion here that files or

evidence relevant to this case have been "discarded, destroyed or irretrievably dispersed." *See*

*Pande*, 598 F. Supp. at 1088.  Nor can the AOC suggest it was prejudiced because it was

unaware of Bales' claims until too late in the process, given that Bales made multiple formal and

informal complaints to the AOC, the EEOC and the MCCR.

Accordingly, although Bales could have—and perhaps should have—brought this suit

earlier, laches will not bar his claims because, accepting as true the facts alleged in Bales'

complaint, Bales' did not unreasonably delay in filing his complaint in a manner that

substantially prejudiced the AOC.

### F.  Maryland Tort Claims Act

The AOC next contends Bales' MFEPA claims are barred because he failed to plead

satisfaction of a condition precedent; specifically, Bales failed to file a "tort claim notice" in

compliance with the Maryland Tort Claims Act ("MTCA"). (ECF No. 17, p. 36).  Bales counters

that filing a tort claim notice with the MTCA is not a condition precedent for his MFEPA claims,

and such a conclusion would create an "unworkable, illogical result" that "derails the statute's

purpose and puts a monkey wrench in how State and federal agencies work together in

combating discrimination." (ECF No. 22, p. 47).  Bales concedes this court "has two divergent

decisions tackling [this] issue," *id.* at 43, and despite the appeal of Bales' argument, I find the

AOC's argument is correct.  Therefore, Bales' failure to file a tort claim notice in compliance with the MTCA is fatal to his MFEPA claims.[4]

The MTCA offers "a limited waiver of sovereign immunity and 'is the sole means by which the State of Maryland may be sued in tort.'" *Royster v. Gahler*, 154 F. Supp. 3d 206, 217 (D. Md. 2015) (citing *Paulone v. City of Frederick*, 718 F.Supp.2d 626, 637 (D. Md. 2010) (citation omitted)).  "Filing a claim with the Treasurer is a 'condition precedent to bringing an action under the MTCA.'" *Id.* (citing *Gray v. Maryland*, 228 F.Supp.2d 628, 641 (D. Md. 2002)).  Specifically, "a claimant may not institute an action . . . unless . . . the claimant submits a written claim to the Treasurer or a designee of the Treasurer within 1 year after the injury to person or property that is the basis of the claim[.]" S.G. § 12–106(b)(1); *see also Royster*, 154 F. Supp. 3d at 217.  "The notice requirement is intended to 'afford[ ] the State the opportunity to investigate the claims while the facts are fresh and memories vivid, and, where appropriate, settle them at the earliest possible time.'" *Royster*, 154 F. Supp. 3d at 217 (citing *Haupt v. State*, 667 A.2d 179, 183 (Md. 1995)).  Because Bales does not allege he complied with this requirement in his complaint, it is critical to determine whether this was a condition precedent or not for his MFEPA claims.

This issue was addressed in the 2012 case *Roberts v. Office of the Sheriff for Charles Cty.*, where Judge Chasanow found the MTCA inapplicable in MFEPA cases. No. CIV.A. DKC

---

[4] Even if I found Bales' failure to comply with the MTCA's notice requirements did not bar Bales' MFEPA claims, his claims would run afoul of the issues discussed previously and in section II, *infra*.  Specifically, this court cannot consider many of Bales' alleged discriminatory acts because a two-year limitations period applies.  Furthermore, Bales would need to link the alleged discriminatory acts to his age or disability, which given the facts alleged, he has largely failed to do.

10-3359, 2012 WL 12762, at *11 (D. Md. Jan. 3, 2012).  There, the court stressed "[t]he MTCA

is a wholly separate statute from the FEPA, and there is no cross-reference in either statute to the

other." *Id.*  The court further stated "FEPA's only notice requirement is set out in section 20–

1013 of the State Government Article of the Maryland Code," which only "requires that an

administrative claim be filed with the Maryland Human Relations Commission." *Id.*  Finding

that "the MTCA applies only to tort actions brought under that Act," and determining that

"employment discrimination is not a tort," the court concluded the plaintiff was not required to

first comply with the MTCA. *Id.*

Despite the holding in *Roberts*, Judge Hollander reached a different conclusion when she

more recently addressed this exact issue in the 2015 case *Royster v. Gahler*, concluding, "the

notice requirement of the MTCA *is applicable to an employment discrimination claim against

the State*." 154 F. Supp. 3d 206, 220 (D. Md. 2015) (emphasis added).  There, the court relied

heavily on *Hansen v. City of Laurel*, a recent Maryland Court of Appeals case. *Royster*, 154 F.

Supp. 3d at 218-19.  In *Hansen*, the court held that a plaintiff seeking to sue the local

government for employment discrimination must first comply with notice requirements of the

Local Government Tort Claims Act ("LGTCA"). *Hansen v. City of Laurel*, 25 A.3d 122 (Md.

2011).  Judge Hollander acknowledged although the LGTCA and the MTCA are not "identical,"

"analysis of one statute informs analysis of the other" because, *inter alia*, both were enacted by

the Maryland General Assembly for similar reasons, and because the "Maryland Court of

Appeals has drawn comparisons between the LGTCA and MTCA." *Id.* at 218; *see also Espina v.

Jackson*, 112 A.2d 442, 450 (Md. 2015) (drawing on analysis of the MTCA to find that the

LGTCA "appears to encompass constitutional torts").  Finding that because "in the context of the

27

LGTCA, the Maryland Court of Appeals has broadly defined the term 'tort'" to include

employment discrimination, *id.* at 219, and stressing that the *Roberts* court failed to discuss

*Hansen* altogether, the *Royster* court concluded "the notice requirement of the MTCA is

applicable to an employment discrimination claim against the State," *id.* at 220.

Admittedly, Bales makes a persuasive argument that the "provisions contained in FEPA

create detailed, well considered and an exhaustive process for handling discrimination matters,

none of which includes deferral or consideration of the MTCA." (ECF No. 22, p. 45).  Despite

this, however, the case law from the Maryland Court of Appeals, and Judge Hollander's

interpretation of that case law, is more persuasive.  Furthermore, the United States Court of

Appeals for the Fourth Circuit has also held that other state claims are subject to the notice

requirement under the MTCA. *See, e.g.*, *McNeal v. Montgomery Cty., Md.*, 307 F. App'x 766,

772 (4th Cir. 2009) (upholding district court's grant of summary judgment as to the state law

claims because [plaintiff] failed to give proper notice under the Maryland Tort Claims Act).

Accordingly, Bales' state law claims under MFEPA are barred because he has failed to

allege compliance with the MTCA's notice provision in his complaint.

* * * * *

Bales' claims brought under MFEPA are barred because he failed to comply with the

notice requirements of the MTCA.  Furthermore, given the foregoing discussion, a two-year

statute of limitations period applies to Bales' Rehabilitation Act claims, Bales' Rehabilitation

Act claims are not subject to any exhaustion requirements, and they are not barred by laches.

This court will only consider alleged acts occurring after October 28, 2013, with the exception of

considering a hostile work environment period prior to October 28, 2013, if Bales can establish a "continuing violation."

## II.  Failure to state a claim

Remaining are Bales' claims under § 504 of the Rehabilitation Act, which mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[5] *Reyazuddin v. Montgomery Cty., Maryland*, 789 F.3d 407, 413 (4th Cir. 2015) (citing 29 U.S.C.A. § 794(a)). "Employment discrimination claims brought under Section 504 are evaluated using the same standards as those 'applied under . . . the Americans with Disabilities Act of 1990.'" *Id.* (citing 29 U.S.C.A. § 794(d)). I next turn to whether Bales has alleged sufficient facts to support his remaining claims under § 504: (a) discrimination in the terms and conditions of employment (Count 1); (b) retaliation in the terms and conditions of employment (Count 2); (c) failure to reasonably accommodate (Count 3); and (d) constructive discharge (Count 4).

### A.  *Discrimination in the terms and conditions of employment (hostile work environment)*

Bales' first count alleges discrimination in the terms and conditions of employment under § 504 of the Rehabilitation Act. (ECF No. 13, ¶ 312). The parties disagree over the scope of this count; the AOC suggests it only covers allegations of a hostile work environment (ECF No. 25,

---

[5] Bales alleges in his complaint, and the AOC does not refute in its briefing, that "the [AOC] receives federal grants, contracts and/or other financial assistance, thereby subjecting itself to the requirements of Section 504 of the Rehab Act." (ECF No. 13, ¶¶ 317, 332, 346).

p. 21), whereas Bales contends this count covers both a hostile work environment claim and various discrete acts of discrimination (ECF No. 22, pp. 27-28).  Although Bales is correct that the Rehabilitation Act covers more than just his allegations of a hostile work environment, I will only consider the hostile work environment claim under count one because Bales' other allegations of discrete discriminatory acts are covered under counts two, three, and four, *infra*.[6]

To establish a hostile work environment claim under § 504 of the Rehabilitation Act, Bales must prove: "(1) he is a qualified individual with a disability; (2) he was subjected to unwelcomed harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment, and (5) some factual basis exists to impute liability for the harassment to the employer." *Rock v. McHugh*, 819 F. Supp. 2d 456, 471 (D. Md. 2011) (citing *Fox v. Gen. Motors Corp.,* 247 F.3d 169, 177 (4th Cir. 2001)).  The "standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking 'the ordinary tribulations of the workplace.'" *Wang v. Metro. Life Ins. Co.,* 334 F. Supp. 2d 853, 864 (D.Md.2004) (citing *Mackey v. Shalala,* 360 F.3d 463, 468 (4th Cir.2004)).  Furthermore, while the second element is subjective, "the rest of the test is made up of objective components based on a 'reasonable person' standard. *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).  "To determine whether a reasonable person would perceive workplace conduct to be severe and pervasive, the court considers a number of

---

[6] I also agree with the AOC that although "Mr. Bales contends that he plead [sic] additional disability discrimination claims under the auspices of the terms and conditions count[,]" the "structure of the pleading and count suggests that it is . . . the hostile work environment count." (ECF No. 25, pp. 21-22, n. 5).

factors, such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance.'" *Rock*, 819 F. Supp. 2d at 471 (citing *Fox,* 247 F.3d at 178).

As an initial matter, Bales' hostile work environment claim runs into a statute of limitations issue.  In his complaint, Bales' alleges numerous instances of harassment and discrimination including, *inter alia*:

> [S]abotage of his work equipment; assault and battery; being deliberately farted upon; bullying and being inappropriately touched in a crotch-scratching incident; being told sexually derogatory comments about his daughter; being ridiculed for complaining and enduring threats that his personnel file would be filled with false incidents; [being] subjected to false reports; [being] subjected to increased and disparate workplace scrutiny; denial of lunch breaks afforded others; [being] required to perform humiliating and physically intensive tasks; [being] subject[ed] to age and disability harassment, humiliation, assault and battery at an off-site training class just weeks after his heart attack in 2012; interference and harassment concerning appointments with medical health providers and medical leave; refusal to sign off on time report which would allow him to be paid; [and being] administered a de facto demotion and marginalization of job duties.

(ECF No. 22, pp. 29-30).  Construing the factual allegations in the light most favorable to Bales, this discrimination may have been "severe or pervasive" enough to "alter the terms, conditions, or privileges of [his] employment" if these alleged acts occurred within the limitations period. However, none of these alleged acts occurred within the limitations period because they all occurred prior to October 28, 2013.

As discussed *supra* in section I(D), in order to consider these pre-October 28, 2013 acts under the "continuing violation doctrine," there must be an act "contributing to the claim" within the filing period. *Morgan*, 536 U.S. at 117.  The alleged acts occurring after October 28, 2013, however, cannot revive Bales' stale allegations.  The relevant acts occurring after October 28, 2013, include:

- November 2013: Bales' notification of possible "relegat[ion]" to a cubicle (ECF No. 13, ¶¶ 237-39);
- December 2013: Bales' allegations he was having his computer access monitored (*Id.* at ¶ 246);
- January 30, 2014: Bales' placement on paid administrative leave following an outburst at the "Workplace Bullying presentation" (*Id.* at ¶¶ 249-61);
- March 12, 2014: Bales' allegations of involuntary referrals for medical evaluations by the State Medical Director (*Id.* at ¶¶ 270-84),
- April 11, 2014: Bales' further allegations of involuntary referrals for medical evaluations by the State Medical Director (*Id.* at ¶¶ 285-87);
- June 16, 2014: Bales' allegation the AOC "order[ed]" him to attend an independent psychological evaluation, which he did not attend (*Id.* at ¶ 288);
- June 5, 2015: AOC's request for Bales to attend a "mandatory" meeting, which Bales did not attend (*Id.* at 292-97); and
- July 25, 2014: Bales' "forced" early retirement with an effective date of July 1, 2014 (*Id.*at ¶ 299).

Simply put, these alleged acts did not "contribute" to Bales' allegations of harassment at the hands of his coworkers that occurred prior to October 23, 2013.  First, most of these allegations post-October 28, 2013 constitute "discrete" acts of discrimination and such allegations do not revive the untimely portion of Bales' hostile work environment allegations.  *See Morgan*, 536 U.S. at 114 (noting "[e]ach [discrete] incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'").  Furthermore, the alleged post-October 28, 2013 acts are unrelated to the untimely hostile work environment allegations.  For example, the allegations regarding referrals for medical evaluations, or the AOC's decision to place Bales administrative leave, have nothing to do with the hostile work environment allegations prior to October 28, 2013.  Indeed, Bales' more-recent allegations do not reference the "same type of employment actions," did not "occur[] relatively frequently," and were not "perpetrated by the same managers." *Id.* at 120 (highlighting facts that

might support a finding that later actions are part of "the same actionable hostile environment claim").

Bales cites to *Mattison v. Maryland Transit Administration* where this court recently refused to dismiss a hostile work environment claim under § 504 of the Rehabilitation Act. (ECF No. 22, p. 31-32). There, this court refused defendant's "attempt to distill the Plaintiff's allegations down to three discrete acts of discrimination," finding instead the plaintiff alleged "numerous instances of harassment" that reflected "an ongoing campaign of harassment that has affected [plaintiff's] performance, health, and emotional state." *Mattison v. Maryland Transit Administration*, No. 15-cv-1627, p. 19-20 (D. Md. May 18, 2016). However, the *Mattison* court stressed that the alleged "numerous instances of harassment" in that case occurred "*within the time period.*" *Id.* at 19 (emphasis added). Here, in contrast, Bales' allegations suggesting numerous instances of harassment occurred *outside* the limitations time period.

Considering only Bales' post-October 28, 2013 allegations, Bales has not sufficiently pled facts to support a hostile work environment claim. Again, discrete discriminatory acts do not support a hostile work environment claim; rather, I consider them *infra* under counts two, three, and four. Viewing Bales' allegations as a whole, there appears to be a significant difference between his time at JIS Annex, and his time at JIS Riva. Although his allegations regarding his time at JIS Annex would have likely supported a hostile work environment claim had they been timely, his allegations regarding his time at JIS Riva post-October 28, 2013 simply do not. Although interspersed between his allegations of discrete acts of harassment, Bales alleges he was subjected to "continuing harassment, discrimination and retaliation," such generic and unsupported allegations are insufficient to support a hostile work environment claim.

33

Furthermore, Bales has not met his burden of demonstrating these alleged discriminatory acts were based on his *disability*.  For harassment to be actionable, it must be based on a disability and these allegations fall far short of alleging any such connection.  *See Fox*, 247 F.3d at 179 (stressing that "the harassment [must be] sufficiently related to the plaintiff's disability").  For example, Bales fails to establish a connection between any disability (e.g., PTSD) and having his computer monitored, or between any disability and the AOC's decision to place Bales on administrative leave following an outburst at the "Workplace Bullying Presentation."

Accepting Bales' factual allegations as true, and considering timely allegations of discriminatory acts, Bales has failed to sufficiently plead facts establishing a plausible hostile work environment claim under § 504 of the Rehabilitation Act.

### B.  Retaliation in the terms and conditions of employment

Count two in Bales' amended complaint alleges retaliation in the terms and conditions of employment under § 504 of the Rehabilitation Act. (ECF No. 13, ¶¶ 327-40).  "Although the Rehabilitation Act does not have a specific retaliation provision, it incorporates the remedies applicable under the Americans with Disabilities Act [("ADA")]." *Dones v. Donahoe*, 987 F. Supp. 2d 659, 671, n.4 (D. Md. 2013).  "Under the Rehabilitation Act, to establish a *prima facie* case of retaliation, Plaintiff must show that: (1) he engaged in a protected activity; (2) his employer acted adversely against him; and (3) the protected activity was causally connected to the adverse action. *Dones v. Brennan*, 147 F. Supp. 3d 364, 370 (D. Md. 2015); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir. 2001); *Dones v. Donahoe*, 987 F. Supp. 2d at 671.

Bales contends he repeatedly engaged in "protected activities," by "not just [] filing several administrative charges, but also [by] raising repeated internal complaints, even one on

behalf of a co-worker." (ECF No. 22, p. 39).  However, many of these alleged "protected

activities," and the associated alleged retaliatory acts, occurred outside the two-year statute of

limitations period.  Bales further fails to establish a prima facie case of retaliation regarding

several additional timely allegations of retaliatory acts, such as the AOC's decision to potentially

reassign Bales to a cubicle, the AOC's decision to place Bales on administrative leave, and the

AOC's repeated involuntary medical referrals.  Because there is not significant disagreement

regarding whether Bales meets the first requirement,[7] I will focus on the second and third

prongs.

   i.   *Sufficiently adverse action*

Regarding the second prong, "the antiretaliation provision protects an individual not from

all retaliation, but from retaliation that produces an injury or harm."  *Burlington N. & Santa Fe*

*Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  Specifically, "a plaintiff must show that a *reasonable*

*employee* would have found the challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."  *Id.* at 68 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006))

(internal citations omitted).  Furthermore, in this context, "trivial harms" and actions like "petty

slights, minor annoyances, and simple lack of good manners" are insufficient to support a

retaliation claim. *Id.* at 68.

---

[7] Bales contends he engaged in protected activity: "in late March of 2012; September 6, 2012;
April/May of 2013; May 7, 2013; January 31, 2014; and the spring of 2014." In addition, Bales
suggests he "repeatedly opposed the illegal to attempts force him into multiple forced referrals
for medical evaluations in June of 2012; October of 2012; February of 2014 and June of 2014."
(ECF No. 22, p. 39) (internal citations to complaint omitted).

Here, Bales' alleges he filed his first amended charge with the EEOC "on or about May 7, 2013," and that as a result of this charge, he was reassigned to the position of Information Security Administrator II, effective on June 5, 2013, which he alleges was a "*de facto* demotion." (ECF No. 13, ¶¶ 205-31).  Although this alleged "*de facto* demotion" occurred outside the limitations period and cannot be considered, I find it worth noting a reasonable employee would not find this "a materially adverse action."  Indeed, the reassignment appears to be the *positive* result of Bales' repeated complaints regarding issues with his previous coworkers.  Put another way, this reassignment provided Bales relief from having to interact with his alleged harassers on a weekly basis.  Furthermore, Bales' new position had "comparable duties, responsibilities, technical experience, and salary" as his old position. *Id.* at ¶ 211. Bales claims his new responsibilities were lesser in some facets, such as not "requir[ing] a similar level of expertise," being more "administrative" rather than "technical," and having "far less visibility," but it is to be expected that different positions will have somewhat different responsibilities. (ECF No. 13, ¶ 231.  In sum, even if this court could consider this alleged "*de facto* demotion," given that Bales repeatedly requested to be excused from weekly meetings with his coworkers at JIS Annex, and the AOC eventually acquiesced by reassigning Bales to this new position, a reasonable employee would not view this reassignment as a retaliatory act.

Bales also alleges he was retaliated against when he was notified of a potential reassignment to a cubicle in November 2013. *Id.* at ¶ 238.  The parties dispute whether this reassignment actually occurred, but even if Bales had been reassigned, the movement of an employee to "an inferior office or eliminating an employee's work station" is not an adverse employment action for a retaliation claim. *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp.

2d 480, 492 (D. Md. 2013) (citing *Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011)

("[N]one of the following constitutes an adverse employment action in a retaliation claim: failing

to issue a performance appraisal; moving an employee to an inferior office or eliminating the

employee's work station; considering the employee "AWOL"; or issuing a personal improvement

plan, "an 'Attendance Warning,'" a verbal reprimand, "a formal letter of reprimand," or "a

proposed termination.").  Therefore, this potential cubicle reassignment does not constitute a

"sufficiently adverse action."

Bales further alleges he was retaliated against when he was placed on administrative

leave following his January 2014 comments regarding the anti-bullying training. (ECF No. 13,

¶¶ 257-69).  As the AOC clearly points out, even if Bales' comments in response to this training

were a protected activity, placing an employee on *paid* administrative leave following an

"outburst, use of profanity and loss of emotional control," is not objectively a materially adverse

action. *See, e.g.*, *Burlington*, 548 U.S. at 73 (finding that a "37–day suspension without pay was

materially adverse").  Bales, however, takes issues with the suggestion he used profanity and lost

control, instead suggesting he merely "began to get teary" and "left the room," and if he used

profanity "this was not grounds to place him on administrative leave" because other co-workers

regularly used profanity in the workplace. (ECF No. 13, ¶¶253-67).  Construing these factual

allegations in the light most favorable to Bales, even if he never used profanity or lost control,

the decision to place him on *paid* leave after this reaction was not a "sufficiently adverse action."

Although the *Burlington* standard "is an objective one," "the fact that an employee

continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light

as to whether the actions [of the employer] are sufficiently material and adverse to be

actionable." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008). Specifically, Bales continually attempted to remedy what he perceived to be discriminatory acts, as evidenced by his filing of several charges of discrimination with the EEOC and numerous internal complaints, often through counsel.  The fact that none of these abovementioned alleged retaliatory acts ever dissuaded Bales from "making or supporting a charge of discrimination," suggests the acts were not "materially adverse." *Burlington*, 548 U.S. at 68.

There is, however, one instance where Bales *may* have alleged a "sufficiently adverse action."  Specifically, Bales alleges, "under threat of discipline," he was required to sign a release for medical records and forced to submit to a medical evaluation in March 2014. (ECF No. 13, ¶ 280).  After this referral, Bales alleges he was informed the "AOC had [again] decided to involuntarily force Mr. Bales to be evaluated by the State Medical Director" on April 11, 2014. *Id.* at ¶ 285.  After this, Bales was next referred to "attend an independent psychological evaluation on June 16, 2014, to assess [his] ability to perform the essential functions of his position, with or without a reasonable accommodation." *Id.* at ¶ 288.  Bales alleges "through counsel, [he] continually engaged in protected activity by opposing the harassing mandates" because they were in violation of both "federal and state statutes and an unnecessary invasion of his privacy." *Id.* at 291.[8]

---

[8] The first prong requires Bales to have "engaged in a protected activity." *See Dones*, 147 F. Supp. 3d at 370.  In this specific instance, the protected activity was "refusing to follow orders that would result in discrimination." *See, e.g.*, U.S. EEOC, *Facts About Retaliation*, https://www.eeoc.gov/laws/types/retaliation.cfm (highlighting examples of "protected activities").  This "opposition activity" is a form of protected activity that "encompasses the use of informal grievance procedures as well as the staging of informal protests and voicing of one's opinions in order to bring attention to an employer's discriminatory behavior." *Felix v. Sun Microsystems, Inc.*, No. CIV. JFM-03-1304, 2004 WL 911303, at *18 (D. Md. Apr. 12, 2004).

To determine whether these referrals were sufficiently adverse, Bales contends

"[a]dministrative interpretations of the ADA by the enforcing agency (here, the EEOC), 'while

not controlling upon the courts by reason of their authority, do constitute a body of experience

and informed judgment to which courts and litigants may properly resort for guidance.'" *Porter*

*v. U.S. Alumoweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997) (citing *Meritor Sav. Bank v. Vinson,*

477 U.S. 57, 65 (1986)).  According to the EEOC's enforcement guidance:

> The ADA does not prevent an employer from requiring an individual to go to an
> appropriate health professional of the employer's choice *if the individual provides
> insufficient information from his/her treating physician* (or other health care
> professional) to substantiate that s/he has an ADA disability and needs a
> reasonable accommodation. However, *if an individual provides insufficient
> documentation in response to the employer's initial request, the employer should
> explain why the documentation is insufficient and allow the individual an
> opportunity to provide the missing information in a timely manner.*
> Documentation is insufficient if it does not specify the existence of an ADA
> disability and explain the need for reasonable accommodation.

EEOC Enforcement Guidance, Reasonable Accommodation under the Americans with

Disabilities Act, available at https://www.eeoc.gov/policy/docs/accommodation.html#N_33

(emphasis added).  Furthermore, the EEOC Enforcement Guidance states:

> If an individual provides sufficient documentation to show the existence of an
> ADA disability and the need for reasonable accommodation, *continued efforts by
> the employer to require that the individual see the employer's health professional
> could be considered retaliation.*

*Id.*

Here, Bales' had already notified the AOC of his medical issues, and he contends the new referrals did not "state the actual reasons for the medical evaluation." (ECF No. 13, ¶ 272). Despite this, however, the facts alleged actually suggest the first referral was to "generally assess [Bales'] ability to perform the essential functions of his position" after his outburst at the Workplace Bullying presentation, *id.* at ¶ 272, and the next referral resulted from the Medical Examiner's findings that Bales' "mental status [was] essentially unremarkable," *id.*at ¶ 284. Further, the AOC is correct when it suggests it may "make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." (ECF No. 17, p. 43) (*citing Coursey v. Univ. of Maryland E. Shore*, 577 F. App'x 167, 173 (4th Cir. 2014) (*citing* Porter v. U.S. Alumoweld Co., 125 F.3d 243, 246 (4th Cir. 1997) (*quoting* 29 C.F.R. pt. 1630, App. § 1630.14(c))). Ultimately, whether these referrals amount to a "sufficiently adverse action" is an issue I choose not to decide because, as the following section clarifies, these referrals fail the causation requirement.

> ii.    *Causation*

The parties disagree on the correct causation standard required to establish a *prima facie* case of retaliation; while the AOC suggests "but-for causation" is required (ECF No. 17, p. 28), Bales contends such a view is incorrect (ECF No. 22, p. 40). Because the remaining retaliation claim is brought pursuant to the Rehabilitation Act, however, the AOC's view is correct.

Although the "ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts," the "language of these two statutory provisions regarding the *causative link* between discrimination and adverse action is

*significantly dissimilar.*" *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999)

(emphasis added). "Section 504 of the Rehabilitation Act states that '[n]o otherwise qualified

individual with a disability . . . shall, *solely by reason of* her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination' by specified

entities." *Id.* at 469 (citing 29 U.S.C.A. § 794(a)) (emphasis added). Therefore, Bales must

establish he was retaliated against *solely* on the basis of his disability. *Id.*; *see also Sellers by*

*Sellers v. Sch. Bd. of City of Mannassas, Va.*, 141 F.3d 524, 528 (4th Cir. 1998) ("We have held

that to establish a violation of section 504, plaintiffs must prove that they have been

discriminated against—that they were excluded from the employment or benefit *due to*

*discrimination* solely on the basis of the disability.") (internal quotations omitted). Bales' alleged

facts do not meet this but-for causation standard.

Regarding involuntary medical referrals, Bales contends he repeatedly objected to the

requests, through counsel, and yet the AOC continued to refer him for additional medical and

psychological evaluations. The alleged facts, however, suggest these referrals had nothing to do

with his disability, but rather the AOC wanted to "assess [Bales'] ability to perform the essential

functions of his position" after his outburst at the Workplace Bullying Presentation. (ECF No.

13, ¶ 272). Put another way, Bales' alleged disabilities (e.g., PTSD) were not the *sole cause* of

the referrals, but rather the AOC requested the referrals in response to Bales' outburst at the

Workplace Bullying presentation, which rendered him incapable of performing his duties.

Accordingly, even assuming these referrals constituted "sufficiently adverse actions," Bales'

factual allegations, construed in the light most favorable to him, do not meet this but-for

causation standard.

41

Regarding Bales' other allegations, his complaint also fails to allege sufficient facts establishing causation.  Bales makes no additional allegations of materially adverse employment actions occurring *solely* because of his engagement in any protected activity.  And regarding Bales' filing of administrative charges, there can be no inference of causation because of the delay between Bales' filing of charges—September 6, 2012, May 7, 2013, and February 2015—and any alleged materially adverse action.  *Pepper v. Precision Valve Corp.*, 526 F. App'x 335, 337 (4th Cir. 2013) (finding ten-month lapse insufficient to establish causation); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient).

\* \* \* \* \*

Accordingly, construing Bales' factual allegations in the light most favorable to Bales, he has failed to plead a claim for retaliation under § 504 of the Rehabilitation Act.

### C.  *Failure to reasonably accommodate*

"To establish a claim under the Rehabilitation Act for a failure to accommodate, a plaintiff must show that (1) he has a disability; (2) his employer knew of the disability; (3) with reasonable accommodations he is otherwise qualified to perform the essential functions of the employment position in question; and (4) his employer refused to make such reasonable accommodations." *Lewis v. Gibson*, 621 F. App'x 163, 164 (4th Cir. 2015), *cert. denied sub nom. Lewis v. McDonald*, 136 S. Ct. 840, 193 L. Ed. 2d 744 (2016).  To trigger an employer's duty to accommodate under either the ADA or the Rehabilitation Act, the employee "cannot merely make a mundane request for a change at his workplace; the request must be [1] sufficiently direct and specific and [2] must explain how the accommodation requested is linked to some disability." *See* 2 Americans with Disab.: Pract. & Compliance Manual § 7:173; *see also*

*Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91 (1st Cir. 2007).  The notice requirement

of the second prong is "not an onerous [burden]," but an employee must still inform the

employer of his disability *and* his need for reasonable accommodations for that disability. *Works*

*v. Colvin*, 93 F. Supp. 3d 405, 416 (D. Md. 2015) (citing *Schneider v. Giant of Maryland, LLC*,

389 Fed.Appx. 263, 270 (4th Cir. 2010)).  The AOC does not contest that Bales indeed "was an

individual with a disability within the meaning of the . . . statute[]" (ECF No. 17, p. 31, n. 6), but

for the foregoing reasons, Bales has not established the *prima facie* elements of an

accommodation claim under the Rehabilitation Act.

  As an initial matter, because a two-year limitations period applies to Bales'

Rehabilitation Act claims, my analysis is limited to alleged failures to accommodate after

October 28, 2013.  The primary allegation during the relevant period is that Bales was "notified

[in November 2013] he would have to leave his office and be relegated to a cubicle situation

with rotating shifts." (ECF No. 13, ¶ 238).  In response to this notification, Bales, "through

counsel, informed the AOC OLC by letter dated November 12, 2013 that Mr. Bales' diabetic

condition and need to frequently monitor and test his blood sugar levels was yet an additional

reason for Mr. Bales to remain in a private office." *Id.* at ¶ 244.  There is no allegation in Bales'

complaint or Bales' subsequent briefing to suggest the AOC ever reassigned Bales to a cubicle,

or that Bales' request to remain in his private office was denied.  Rather, Bales suggests he was

simply "harassed due to his [request]."[9]  (ECF No. 22, p. 42).  If anything, the facts suggest

---

[9] From Bales' opposition motion, Bales states:
  Then, in or around November 12, 2013, Mr. Bales requested as an
  accommodation the right to remain in his private office as oppose to his cubicle to
  address his disabilities. *While the Agency claims that he failed to plead that he*

Bales made a request to the AOC to remain in his private office, and the AOC honored this request. Certainly, this does not qualify as a failure to accommodate.  In any event, even if he had been relocated, Bales would have needed to explain why the accommodation was *needed* due to a disability, which he has not sufficiently pled.

Bales further contends he made other requests for accommodation, such as requesting reassignment from his position in November 2013 to another group or position, *id.* at ¶ 240, but as an initial matter, this request does not appear to be related to any *disability*.  Furthermore, Bales' requests for reassignment to another group or position due to his lack of satisfaction with his current work would be "unreasonable."  *See, e.g., Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1260 (11th Cir.2001) ( "[E]mployers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists.").  Not only does the AOC's denial of this request not relate to any disability, but the request itself is an unreasonable one because the AOC is not required to reassign Bales to another group or position due to his lack of satisfaction.

Next, Bales suggests his objections about the AOC referring him to the State Medical Director "were, in fact, requests for accommodation on a stand-alone basis."  Not only is this allegation confusing, but it fails the second prong of the *prima facie* test for accommodation

---

*was denied this accommodation, he has pled that he was harassed due to his and that the harassment which he endured caused him to be forced into an involuntary and constructive discharge effective July 1, 2014.*
(ECF No. 22, p. 42) (emphasis added).

because no "sufficiently direct and specific" request was made regarding any accommodation,

nor did Bales explain how the "accommodation request is linked to a disability."

Lastly, Bales also alleges the AOC failed to accommodate his disability by delaying

approval of his FMLA leave requests.  Although nearly all of these requests occurred outside the

relevant period, I still find it worth noting the AOC ultimately approved Bales' numerous FMLA

requests over the years.  For example, the AOC approved, *inter alia*:

- Bales' FMLA initial request in June 2012 (ECF No. 23, ¶¶ 132-34);
- a request for "continuous leave . . . for the administration of psychotherapy and to treat excessive anxiety" in November 2012, (*id.* at ¶¶ 173-79);
- Bales' FMLA request for "a brief period of intermittent FMLA leave on August 28, 2013; September 13, 2013; September 20, 2013; September 25, 2013; and September 27, 2013," in August 2013 (*id.* at ¶ 215); and
- Bales' request for "FMLA leave from 1/14/13 through 9/10/14 . . . [for] episodes up to 3 days," in September 2013 (*id.* at  226).

Bales essentially takes issue with the AOC's requests for additional documentation prior to

approving his multiple FMLA requests, and the AOC's requests that he sometimes reschedule

appointment times so that they would be more "fair" to the department. *Id.* at ¶ 227.  I disagree

with Bales' assessment that this amounts to a failure to accommodate; the AOC did not "refuse

to make an accommodation" as required, but rather made reasonable-seeming requests prior to

ultimately approving Bales' numerous FMLA requests.

In short, Bales has failed to allege a failure to accommodate claim under § 504 of the

Rehabilitation Act.

### D.  Constructive discharge

Bales alleges "[d]ue to the continuing harassment, discrimination and retaliation, all of

which was causing Mr. Bales to experience extreme harm of his physical and mental well being,

Mr. Bales was forced into applying for an early retirement from AOC so as to protect both his physical and mental well-being." (ECF No. 13, ¶ 298).  In essence, Bales claims his decision to retire early amounted to a constructive discharge.

"In this circuit, the standard for constructive discharge requires a plaintiff to show both [1] intolerable working conditions and [2] a deliberate effort by the employer to force the employee to quit." *Raiford v. Maryland Dep't of Juvenile Servs.*, No. CIV.A. DKC 12-3795, 2015 WL 4485497, at *9 (D. Md. July 21, 2015) (citing *Johnson v. Shalala,* 991 F.2d 126, 131 (4th Cir.1993)).  The "[i]ntolerability of working conditions . . . is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied*, *Bristow v. Daily Press, Inc.*, 475 U.S. 1082 (1986).  Regarding the second prong, "[b]ecause the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, [the Fourth] Circuit has insisted that it be carefully cabined." *Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 187 (4th Cir. 2004).  However, the "traditional standard of constructive discharge . . . does not neatly translate to the context of the Rehabilitation Act." *Johnson*, 991 F.2d at 131.  Accordingly, the Fourth Circuit has concluded, in Rehabilitation Act claims, in order "to prevail, a plaintiff must show more than mere failure to accommodate; he 'must present some evidence that the employer *intentionally sought to drive* her from her position.'" *Raiford*, 2015 WL 4485497, at * 9 (citing *Johnson*, 991 F.2d at 132) (emphasis added).  Although it is possible Bales meets the first requirement, he fails to meet the second prong that the AOC *deliberately* forced him to quit.

Regarding the first prong, it is possible Bales has alleged facts establishing his working conditions were objectively intolerable. "Constructive discharge claims are held to a high standard, and '[e]ven truly awful working conditions may not rise to the level of constructive discharge.'" *Tawwaab v. Virginia Linen Service, Inc.*, 729 F. Supp. 2d 757, 783 (D. Md. 2010) (quoting *Hill v. Verizon Md., Inc.*, No. RDB-07-3123, 2009 WL 2060088, at *13 (D. Md. July 13, 2009)). On one hand, at the time of his early retirement, the AOC had transferred Bales away from his alleged abusers at JIS Annex to JIS Riva, and then transferred him into an entirely new position away from his alleged abusers. This does not suggest his conditions were objectively intolerable. Furthermore, although Bales was dissatisfied with his work assignments and alleges he suffered a "*de facto* demotion," this does not amount to "objectively intolerable work conditions." *See, e.g.*, *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (citing *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)) (stressing the mere "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."). On the other hand, Bales does allege the AOC repeatedly threatened early termination if he failed to comply with multiple involuntary medical referrals. Furthermore, Bales suggests that his entire employment period should be considered for his constructive discharge claim under the continuing violation doctrine because he was subjected to a hostile work environment. (ECF No. 22, p. 36).

In any event, even assuming Bales meets this first requirement, he does not meet the second prong necessary to establish a constructive discharge claim. Under the second prong, Bales is required to prove "a deliberate effort by the [the AOC] to force [Bales] to quit."

*Johnson*, 991 F.2d at 131.  Bales has not alleged any facts demonstrating a deliberate intention

by the AOC to force him to quit.  While Bales takes offense, perhaps understandably so, at the

AOC's repeated medical referrals to the State Medical Director, these can also be seen as a

reasonable measure undertaken by the AOC to ensure Bales could perform his duties.  And the

AOC's decision to place Bales on paid administrative leave in January 31, 2014 in the wake of

his reaction to the Workplace Bullying training, also does not support an inference the AOC

sought to *force* Bales to quit.

     Accordingly, Bales has failed to allege sufficient facts to support a claim of constructive

discharge pursuant to § 504 of the Rehabilitation Act.

## CONCLUSION

     For the foregoing reasons, the AOC's motion to dismiss (ECF No. 17) is granted.  Counts

1 through 11 in Bales' amended complaint (ECF No. 13) are dismissed.

11/21/2016
Date

/s/

J. Frederick Motz
United States District Judge

48